# IN THE UNITED STATES DISTRICT COURT
## FOR THE EASTERN DISTRICT OF VIRGINIA
### Richmond Division

**RUSSELL LEE McBEE,**

      Plaintiff,

v.

Civil Action No. **3:16CV160**

**ERIC WILSON,** *et al.,*

      Defendants.

## MEMORANDUM OPINION

Russell Lee McBee, a federal inmate proceeding *pro se* and *in forma pauperis*, filed this *Bivens*[1] action. In his Complaint, McBee raises the following claims for relief:

Claim One:     Defendants Laybourn and Dicocco[2] were deliberately indifferent to McBee's medical condition, in violation of the Eighth Amendment,[3] by failing to ensure that McBee received a total knee replacement after a specialist recommended that McBee receive one. (Compl. 5–7, ECF No. 4; ECF No. 4–1, at 3–10.)[4]

Claim Two:     Defendants Wilson and Caraway[5] violated McBee's rights under the Eighth Amendment by overlooking McBee's need for a total knee replacement when considering McBee's administrative remedy requests. (ECF No. 4–1, at 6–7, 10–13.)

McBee seeks $247,544.00 in damages as well as injunctive relief. (Compl. at 8.)

---

[1] *Bivens v. Six Unknown Named Agents of Fed. Bureau of Narcotics*, 403 U.S. 388 (1971).

[2] Dr. Katherine Laybourne is the Medical Administrator at FCI Petersburg. (Compl. 2.) Dr. Mark Diccoco is the Clinical Director at FCI Petersburg. (*Id.*)

[3] "Excessive bail shall not be required, nor excessive fines imposed, nor cruel and unusual punishments inflicted." U.S. Const. amend. VIII.

[4] The Court employs the pagination assigned to the Complaint by the CM/ECF docketing system.

[5] Eric Wilson is the Warden of FCI Petersburg. (Compl. 1.) J.F. Caraway is a Regional Director for the Bureau of Prisons ("BOP"). (*Id.* at 3.)

This matter is before the Court on Defendants' Motion to Dismiss (ECF No. 24) or in the alternative Motion for Summary Judgment (ECF No. 25). McBee has responded. (ECF No. 29.) Defendants have filed a Reply. (ECF No. 30.) For the reasons stated below, Defendants' Motion for Summary Judgment will be GRANTED.

## I.  STANDARD FOR SUMMARY JUDGMENT

Summary judgment must be rendered "if the movant shows that there is no genuine dispute as to any material fact and the movant is entitled to judgment as a matter of law." Fed. R. Civ. P. 56(a). The party seeking summary judgment bears the responsibility of informing the Court of the basis for the motion and identifying the parts of the record which demonstrate the absence of a genuine issue of material fact. *See Celotex Corp. v. Catrett*, 477 U.S. 317, 323 (1986). "[W]here the nonmoving party will bear the burden of proof at trial on a dispositive issue, a summary judgment motion may properly be made in reliance solely on the pleadings, depositions, answers to interrogatories, and admissions on file." *Id.* at 324 (internal quotation marks omitted). When the motion is properly supported, the nonmoving party must go beyond the pleadings and, by citing affidavits or "'depositions, answers to interrogatories, and admissions on file,' designate 'specific facts showing that there is a genuine issue for trial.'" *Id.* (quoting former Fed. R. Civ. P. 56(c), (e) (1986)). In reviewing a summary judgment motion, the Court "must draw all justifiable inferences in favor of the nonmoving party." *United States v. Carolina Transformer Co.*, 978 F.2d 832, 835 (4th Cir. 1992) (citing *Anderson v. Liberty Lobby, Inc.*, 477 U.S. 242, 255 (1986)). However, a mere "'*scintilla* of evidence'" will not preclude summary judgment. *Anderson*, 477 U.S. at 251 (quoting *Improvement Co. v. Munson*, 81 U.S. (14 Wall.) 442, 448 (1872)). "'[T]here is a preliminary question for the judge, not whether there is literally no evidence, but whether there is any upon which a jury could properly

proceed to find a verdict for the party . . . upon whom the onus of proof is imposed.'" *Id.* (quoting *Munson*, 81 U.S. at 448). Additionally, "'Rule 56 does not impose upon the district court a duty to sift through the record in search of evidence to support a party's opposition to summary judgment.'" *Forsyth v. Barr*, 19 F.3d 1527, 1537 (5th Cir. 1994) (quoting *Skotak v. Tenneco Resins, Inc.*, 953 F.2d 909, 915 n.7 (5th Cir. 1992)); *see* Fed. R. Civ. P. 56(c)(3) ("The court need consider only the cited materials . . . .").

In support of their Motion for Summary Judgment, Defendants submitted: (1) a declaration from Chantay Stanley, a Paralegal Specialist for the BOP (Mem. Supp. Mot. Summ. J. Ex. 1 ("Stanley Decl."), ECF No. 26–1); (2) copies of the BOP's records regarding the computation of McBee's sentence (*id.* Attach. 1, ECF No. 26–1, at 5–9); (3) copies of McBee's grievance material (*id.* Attachs. 2–5, ECF No. 26–1, at 10–18); (4) Defendant Dicocco's declaration (*id.* Ex. 2 ("Dicocco Decl."), ECF No. 26–2); (5) Defendant Laybourn's declaration (*id.* Ex. 3 ("Laybourn Decl."), ECF No. 26–3); (6) copies of McBee's medical records (Dicocco Decl. Attachs. 1–9, ECF No. 26–2, at 7–38; Laybourn Decl. Attachs. 1–6, ECF No. 26–3, at 6–27); and (7) a copy of the BOP's Clinical Practice Guidelines, Evaluation and Management of Osteoarthritis of the Hip and Knee ("BOP Clinical Guidelines," Mem. Supp. Mot. Summ. J. Ex. 4, ECF No. 26–4).

At this stage, the Court is tasked with assessing whether McBee "has proffered sufficient proof, in the form of *admissible* evidence, that could carry the burden of proof of his claim at trial." *Mitchell v. Data Gen. Corp.*, 12 F.3d 1310, 1316 (4th Cir. 1993) (emphasis added). As a general rule, a non-movant must respond to a motion for summary judgment with affidavits or other verified evidence. *Celotex Corp.*, 477 U.S. at 324. In response, McBee submits: (1) his own "Sworn Statement" (ECF No. 29); and, (2) his own "Sworn Affidavit" (ECF No. 32).

Furthermore, the facts offered by affidavit must be in the form of admissible evidence. *See* Fed. R. Civ. P. 56(c). In this regard, the statement in the affidavit or sworn statement "must be made on personal knowledge . . . and show that the affiant is competent to testify on the matters stated." Fed. R. Civ. P. 56(c)(4). Summary judgment affidavits must also "set out facts that would be admissible in evidence." *Id.* Therefore, "summary judgment affidavits cannot be conclusory or based upon hearsay." *Evans v. Techs. Applications & Serv. Co.*, 80 F.3d 954, 962 (4th Cir. 1996) (citing *Rohrbough v. Wyeth Labs., Inc.*, 916 F.2d 970, 975 (4th Cir. 1990); *see also Md. Highways Contractors Ass'n v. Maryland*, 933 F.2d 1246, 1252 (4th Cir. 1991)).

In his Sworn Statement and Sworn Affidavit, McBee makes a number of statements that are of no value in assessing the propriety of summary judgment. The majority of McBee's statements are either conclusory[6] or simply disagree with arguments made by Defendants.[7] McBee's conclusory assertions will not be considered in evaluating the Motion for Summary Judgment. Moreover, McBee failed to swear to the contents of his Complaint under penalty of perjury. The Complaint thus fails to constitute admissible evidence. *United States v. White*, 366 F.3d 291, 300 (4th Cir. 2004). Furthermore, with respect to McBee's Sworn Statement, the Court previously warned McBee that "the Court will not consider as evidence in opposition to any motion for summary judgment a memorandum of law and facts that is sworn to under penalty of perjury." (ECF No. 13, at 2.) Because McBee's Sworn Statement is essentially his

---

[6] For example, McBee states that "[m]edical staff knew or should have known that the knee condition was getting wors[e], and then informed [McBee] of the need for a future possibility of a total knee surgery." (Sworn Statement 4, ECF No. 29.) Such a statement is a mere conclusion, and McBee is not competent to testify about what medical staff knew or should have known.

[7] For example, in response to Defendants' Motion for Summary Judgment, McBee contends that he has no other option to lose weight but to starve himself because "the ability to exercise at this point is nearly impossible." (Sworn Statement 1, ECF No. 29; *see* Sworn Aff. 2, ECF No. 32.)

memorandum opposing the Motion for Summary Judgment, the Court will not consider it as evidence.

In light of the foregoing principles and submissions, the following facts are established for the purposes of the Motion for Summary Judgment. All permissible inferences are drawn in favor of McBee.

## II.    RELEVANT FACTS

### A.    Facts Regarding the BOP's Guidelines for Surgical Procedures

Within the BOP, "[w]hen a medical provider submits a request for an inmate to see a specialty medical provider outsider the correctional facility, such as an orthopedic surgeon, the request generally goes before the institution's Utilization Review Committee ('URC') for approval." (Dicocco Decl. ¶ 7.) The URC is responsible for "review[ing] each consultation request, and determin[ing] whether the consultation [is] appropriate and thus approved, or whether the request should be reviewed at a later date, or denied." (*Id.*) The URC consists of "several institution staff members including the Clinical Director, Health Services Administrator, Assistant Health Services Administrator, Associate Warden, Physicians, and institution scheduling staff." (*Id.*)

When a medical provider requests that an inmate receive an elective procedure, such as hip or knee replacement surgery, the request is not reviewed by the URC. (*Id.* ¶ 8.) Rather, the request goes to the regional office that oversees that institution. (*Id.*) "Such requests from FCC Petersburg go to the Mid-Atlantic Region and are reviewed initially by regional medical staff, typically regional nurses, to determine whether the necessary criteria are met." (*Id.*) Often, these requests are then "forwarded for a secondary review by the Regional Medical Director."

(*Id.*) "Neither [Defendant Dicocco], any medical officer at FCC Petersburg, Warden Wilson, nor Regional Director Caraway are in any way involved in this decision." (*Id.*)

The BOP has also established guidelines for the evaluation and management of osteoarthritis in the hip and knee. (*See* BOP Clinical Guidelines, ECF No. 26–4.) Pursuant to these guidelines, "[o]perative intervention (e.g., with total joint arthroplasty) is considered elective in most cases and is reserved for end-stage disease that fails to respond to nonsurgical interventions." (*Id.* at 9.)[8] To qualify for knee or hip replacement surgery, an inmate must meet certain requirements. (Dicocco Decl. ¶ 6.) "One such criterion is the patient's weight and body mass index ('BMI'), which are considered to rule out a high risk of cardiovascular complications that could adversely affect the procedure." (*Id.*; *see* Laybourn Decl. ¶ 6.) The BOP's guidelines state:

> Weight loss should be recommended for patients with BMI ≥ 25. Even modest amounts of weight loss may slow progression of the disease, reduce pain, and improve the functional status of the patient. In the case of surgical patients, obesity increases the risk for post-operative infection and venous thromboembolism/pulmonary embolism, as well as makes surgery technically more difficult. Inmates with a BMI ≥ 35 will be expected to lose sufficient weight to reduce their BMI to < 35. Inmates with a BMI ≥ 30, but still < 35, will be expected to demonstrate some weight loss and reasonable weight loss efforts—including a reduction of the high-calorie, low-nutrition food items purchased at the commissary.
>
> Exceptions to these criteria may be made on a case-by-case basis, as clinically indicated. When a BOP dietician is not available at the local institution, tele-dietician consultation will be made available for inmates who need specialized counseling in support of their weight loss efforts.

(BOP Clinical Guidelines, at 7 (capitalization corrected), ECF No. 26–4.)

---

[8] The Court utilizes the pagination assigned to this document by the CM/ECF docketing system.

## B. Facts Regarding McBee's Medical Care

McBee arrived at FCI Petersburg on September 24, 2014. (Dicocco Decl. ¶ 1.) At FCI Petersburg, "McBee's medical care is coordinated by a primary medical team, and his primary care provider is a Mid-Level Practitioner ('MLP')." (*Id.* ¶ 4; *see* Laybourn Decl. ¶ 4.)

On October 30, 2014, MLP Luis Negron requested that McBee see an orthopedist for chronic knee pain. (ECF No. 26–2, at 8.) MLP Negron noted that "injections and prednisone have not help[ed]/x-rays show moderate [degenerative joint disease]." (*Id.*) MLP Negron also noted that Plaintiff had been prescribed Amitriptyline, Amlodipine, Aspirin, Atenolol, Benztropine, Colestipol, Doxycycline Monohydrate, Hydrocholorothiazide, Lisinopril, Metformin, Niacin, Oxcarbazepine, Prednisone, Pregabalin, Terazosin, and Ziprasidone for his various medical conditions, including his knee pain. (*Id.*)

McBee saw MLP Negron again on November 6, 2014, to obtain refills of his medication. (*Id.* at 11.) At that time, McBee weighed 270 pounds. (*Id.*) McBee noted that he experienced some relief with Pregabalin. (*Id.*) MLP Negron provided counseling concerning, *inter alia*, McBee's diet. (*Id.* at 12.)

On November 19, 2014, McBee saw MLP Negron for complaints of right knee discomfort. (*Id.* at 15.) McBee stated that he had experienced such discomfort for several years, but that it had gotten worse over the "past week." (*Id.*) McBee told MLP Negron that an injection he had received "the other day help[ed]." (*Id.*) MLP Negron noted that X-rays taken on October 20, 2014 showed moderate degenerative joint disease and that McBee had been placed on the orthopedics list for a follow-up. (*Id.*) MLP Negron assessed chronic knee pain and prescribed Acetaminophen. (*Id.* at 16.) He also gave McBee a Toradol injection and provided further counseling regarding McBee's diet. (*Id.*)

In December of 2014, McBee "had a consultation with a contractor for the Agency regarding the pain he was experiencing in his right knee." (Dicocco Decl. ¶ 5 (citation omitted); *see* Laybourn Decl. ¶ 5.) This contractor "recommended that Mr. McBee receive a total right knee replacement due to degenerative joint disease." (Dicocco Decl. ¶ 5; Laybourn Decl. ¶ 5; *see* ECF No. 26–3, at 7.) McBee requested that the BOP conduct the total knee replacement. (Dicocco Decl. ¶ 9.) At the time of the request, McBee's BMI was over 35. (*Id.*; Laybourn Decl. ¶ 7.)

McBee's request "was reviewed at the Regional level by a URC of regional nursing staff members and then by the Regional Medical Director." (Dicocco Decl. ¶ 9.) On December 23, 2014, McBee's request for a total right knee replacement was disapproved. (*Id.*; ECF No. 26–2, at 18.) The request was denied because of McBee's high BMI and "the cardiovascular risks inherent to his weight." (Dicocco Decl. ¶ 9.) Defendants were not involved in the denial of the request. (Dicocco Decl. ¶ 9; Laybourn Decl. ¶ 7.)

On February 19, 2015, McBee saw Defendant Dicocco for complaints of right knee pain "with evidence of moderate arthritis." (ECF No. 26–2, at 20.) At that time, McBee weighed 284.2 pounds. (*Id.* at 21.) Defendant Dicocco stressed that McBee needed to lose weight, and that he would not receive a "knee replacement or further radiologic evaluations unless he loses weight to a BMI of less than or equal to 30 (around 230 pounds)." (*Id.* at 22.)

On June 17, 2015, MLP Negron requested that McBee seek an orthopedist for evaluation concerning Synvisc injections. (ECF No. 26–3, at 11–12.) MLP Negron noted that McBee's request for a total right knee replacement had not been approved because McBee did not meet the BOP's criteria. (*Id.* at 11.) He further indicated that McBee had been advised to lose weight

and exercise. (*Id.*) MLP Negron noted that at that time, McBee had been prescribed sixteen medications for his various medical conditions, including knee pain. (*Id.*)

McBee saw the orthopedist on August 7, 2015. (*Id.* at 15–16.) The orthopedist concluded that McBee had severe degenerative joint disease in his right knee. (*Id.* at 15.) McBee was given a second Synvisc injection. (*Id.*) The orthopedist recommended that McBee continue to use a wheelchair and receive another Synvisc injection. (*Id.*)

McBee saw the orthopedist again on October 2, 2015. (*Id.* at 16.) McBee indicated that he had experienced no response to the Synvisc injection. (*Id.*) McBee was given another Synvisc injection, and the orthopedist recommended a total right knee replacement. (*Id.*)

At some point in October of 2015, McBee submitted another request to undergo a total knee replacement. (Dicocco Decl. ¶ 11.) At the time of this request, McBee's BMI was approximately 39. (*Id.*) Again, McBee's "request was sent to the Mid-Atlantic Region for review and was reviewed by the regional URC of nursing staff and reviewed secondarily by the Regional Medical Director." (*Id.*) On October 13, 2015, McBee's request was deferred, with a note that his weight should be checked. (ECF No. 26–2, at 31.) Again, Defendants did not review this request. (Dicocco Decl. ¶ 11.) McBee "was informed that weight loss was required for the surgery to be safe given the high risk for negative side effects of surgery in obese patients." (Laybourn Decl. ¶ 9 (citation omitted).) "He was counseled on the need to eat healthy and exercise in order to lose weight and become eligible for the surgery, including that he attempt to use a stationary bicycle." (*Id.* (citation omitted).)

On February 26, 2016, McBee had a follow-up appointment with Frank Koch for nutrition education for weight management. (ECF No. 26–2, at 37.) Mr. Koch provided education to McBee, "including recommendations for mainline and commissary" food selections

to help manage his diet. (*Id.*) He estimated McBee's nutritional needs to be "2025 kcals (25/kg), and 65 gm protein (0.8 gm/kg)." (*Id.*) Mr. Koch noted that the "[m]ainline offerings [were] appropriate [to meet McBee's] needs." (*Id.*) He reviewed "normal portion sizes and servings suggested/day, choosing a healthy diet at mainline (for weight/DM/cardiac purposes), benefits of exercise for weight control and the effect on metabolism" with McBee. (*Id.*) He noted that McBee's commissary records were "poor in quality with many items of concern noted (sugar/carbohydrates and some high-[sodium] items)." (*Id.* at 38.) Mr. Koch "strongly urged [McBee] to choose appropriately at mainline and make commissary changes (decrease amount and change choices)." (*Id.*) McBee verbalized his understanding and stated that he would make the suggested changes. (*Id.*) McBee also "[v]erbalize[d] desire to lose weight to improve [his] knee problem." (*Id.*)

On April 27, 2016, Family Nurse Practitioner ("FNP") K. Crossley requested that McBee see the orthopedist for an assessment and a Synvisc injection. (ECF No. 26–2, at 33–34.) FNP Crossley noted that at that time, McBee had been prescribed sixteen medications for his various medical conditions, including knee pain. (*Id.*)

McBee saw the orthopedist on May 13, 2016. (*Id.* at 34.) McBee told the orthopedist that he had difficulty walking and that he was unable to exercise because of the pain in his knees. (*Id.*) The orthopedist discussed weight reduction with McBee. (*Id.*) The orthopedist also noted that McBee would benefit from a total knee replacement. (*Id.* at 35.)

On October 13, 2016, McBee saw Defendant Laybourn for his diabetes, mental health, and complaints of pain in his right knee. (ECF No. 26–3, at 20.) Defendant Laybourn discussed weight loss with McBee and noted that McBee would need to lose 20 pounds to meet the BOP's criteria for a total right knee replacement. (*Id.*) At that time, McBee weighed 290 pounds. (*Id.*

at 21.) Defendant Laybourn also renewed McBee's prescriptions. (*Id.* at 22–24.) She also provided counseling concerning, *inter alia*, McBee's diet. (*Id.* at 25.)

"FCC Petersburg medical staff have continued to treat Mr. McBee through the present time at FCC Petersburg." (Dicocco Decl. ¶ 12.) McBee "has been treated continuously for his knee pain, including, but not limited to, receiving Synvisc injections to his knee in order to alleviate the pain and discomfort." (*Id.*; *see* Laybourn Decl. ¶ 10.) "To date, Mr. McBee has not reduced his weight such that he would be eligible for the [knee replacement] surgery." (Dicocco Decl. ¶ 12.) "If Mr. McBee were to lose weight and meet the BMI requirements of the Agency's Clinical Practice Guidelines, his eligibility for the total knee replacement would be reconsidered." (Laybourn Decl. ¶ 11.)

### C.     Facts Regarding McBee's Use of the Grievance Procedure

On December 15, 2014, McBee submitted a Request for Administrative Remedy, complaining that medical staff at FCI Petersburg had denied him a necessary total knee replacement. (ECF No. 26–1, at 11–12.) On December 31, 2014, Defendant Wilson responded, stating that McBee had "been provided medical care and treatment consistent with Bureau and community standards." (*Id.* at 14.)

McBee appealed Defendant Wilson's response to the BOP's Mid-Atlantic Regional Office. (Stanley Decl. ¶ 6.) On February 9, 2015, Defendant Caraway responded, stating:

> Your medical plan of care, developed and implemented by your primary care provider team, is adequate and complete. Your condition has been sufficiently addressed and prescribed medication and treatment is appropriate. You are encouraged to continue to work with your primary care provider team for other health care related issues and concerns.

(ECF No. 26–1, at 16.)

McBee appealed Defendant Caraway's response to the BOP's Central Office. (Stanley Decl. ¶ 7.) On October 31, 2016, Ian Connors, the Administrator of National Inmate Appeals, concurred with the previous responses, noting that McBee had "received medical care and treatment in accordance with evidence based standard of care and within the scope of services of the Federal Bureau of Prisons." (ECF No. 26–1, at 18.)

## III. ANALYSIS

To survive a motion for summary judgment on an Eighth Amendment claim, McBee must demonstrate that Defendants acted with deliberate indifference to his serious medical needs. *See Brown v. Harris*, 240 F.3d 383, 388 (4th Cir. 2001). A medical need is "serious" if it "'has been diagnosed by a physician as mandating treatment or one that is so obvious that even a lay person would easily recognize the necessity for a doctor's attention.'" *Iko v. Shreve*, 535 F.3d 225, 241 (4th Cir. 2008) (quoting *Henderson v. Sheahan*, 196 F.3d 839, 846 (7th Cir. 1999)). For purposes of this matter, Defendants acknowledge that "McBee's knee condition may be considered serious." (Mem. Supp. Mot. Summ. J. 9.)

The subjective prong of a deliberate indifference claim requires the plaintiff to demonstrate that a particular defendant actually knew of and disregarded a substantial risk of serious harm to his person. *See Farmer v. Brennan*, 511 U.S. 825, 837 (1994). "Deliberate indifference is a very high standard—a showing of mere negligence will not meet it." *Grayson v. Peed*, 195 F.3d 692, 695 (4th Cir. 1999) (citing *Estelle v. Gamble*, 429 U.S. 97, 105–06 (1976)).

> [A] prison official cannot be found liable under the Eighth Amendment for denying an inmate humane conditions of confinement unless the official knows of and disregards an excessive risk to inmate health or safety; the official must both be aware of facts from which the inference could be drawn that a substantial risk of serious harm exists, and he must also draw the inference.

*Farmer*, 511 U.S. at 837. *Farmer* teaches "that general knowledge of facts creating a substantial risk of harm is not enough. The prison official must also draw the inference between those general facts and the specific risk of harm confronting the inmate." *Johnson v. Quinones*, 145 F.3d 164, 168 (4th Cir. 1998) (citing *Farmer*, 511 U.S. at 837). Thus, to survive a motion for summary judgment under the deliberate indifference standard, a plaintiff "must show that the official in question subjectively recognized a substantial risk of harm. . . . [and] that the official in question subjectively recognized that his actions were 'inappropriate in light of that risk.'" *Parrish ex rel. Lee v. Cleveland*, 372 F.3d 294, 303 (4th Cir. 2004) (quoting *Rich v. Bruce*, 129 F.3d 336, 340 n.2 (4th Cir. 1997)).

In evaluating a prisoner's complaint regarding medical care, the Court is mindful that, "society does not expect that prisoners will have unqualified access to health care" or to the medical treatment of their choosing. *Hudson v. McMillian*, 503 U.S. 1, 9 (1992) (citing *Estelle*, 429 U.S. at 103–04). Absent exceptional circumstances, an inmate's disagreement with medical personnel with respect to a course of treatment is insufficient to state a cognizable constitutional claim. *See Wright v. Collins*, 766 F.2d 841, 849 (4th Cir. 1985) (citing *Gittlemacker v. Prasse*, 428 F.2d 1, 6 (3d Cir. 1970)).

### A.    Claim One—Defendants Laybourn and Dicocco

In Claim One, McBee contends that Defendants Laybourn and Dicocco violated his Eighth Amendment rights by failing to ensure that McBee received a total knee replacement after a specialist recommended that McBee receive one. (Compl. 5–7.) For example, McBee claims that Defendant Laybourn "disregarded the findings and recommendations" of the specialist who advised that McBee should undergo a total knee replacement. (ECF No. 4–1, at 3.) He argues that Defendant Laybourn "[f]ail[ed] to provide treatment" and "should have conveyed to Bureau

of Prisons administrative staff that the BMI necessity should be waived as [McBee] could not come into compliance." (*Id.* at 5.) McBee also suggests that Defendant Dicocco failed to carry out the specialist's recommendation. (*Id.* at 8.) As discussed below, McBee fails to demonstrate that Defendants subjectively recognized a serious risk of harm to McBee and chose to ignore that risk.

At the outset, McBee's claim against Defendants Laybourn and Dicocco fails for lack of personal involvement. "Because vicarious liability is inapplicable to *Bivens* . . . suits, a plaintiff must plead that each Government-official defendant, through the official's own individual actions, has violated the Constitution." *Ashcroft v. Iqbal*, 556 U.S. 662, 676 (2009); *see Trulock v. Freeh*, 275 F.3d 391, 402 (4th Cir. 2001) (noting that liability in a civil rights case is "personal, based upon each defendant's own constitutional violations"). "To survive summary judgment, a plaintiff claiming a violation of [*Bivens*] must produce evidence that the defendant knew of a deprivation and 'approved it, turned a blind eye to it, failed to remedy it, or in some way personally participated.'" *Oakley v. Cowan*, 187 F. App'x 635, 638 (7th Cir. 2006) (some internal quotation marks omitted) (quoting *Johnson v. Snyder*, 444 F.3d 579, 584 (7th Cir. 2006)). "Absent direct participation, there must at least be a showing that the defendants 'acquiesced in some demonstrable way' in the alleged violation." *Id.* (quoting *Palmer v. Marion Cty.*, 327 F.3d 588, 594 (7th Cir. 2003)).

Here, the record before the Court establishes that Defendants Laybourn and Dicocco had no involvement in the denial and deferral of McBee's requests for a total knee replacement. Both of McBee's requests were reviewed at the regional level by a URC and then by the Regional Medical Director. (Dicocco Decl. ¶ 9; ECF No. 26–2, at 31; ECF No. 26–3, at 9.)

Neither Defendant Laybourn nor Defendant Dicocco was involved in these decisions.[9] (Dicocco Decl. ¶¶ 9, 11; Laybourn Decl. ¶ 7.) For this reason alone, McBee's claim against Defendants Laybourn and Dicocco lacks merit. *See Ward v. Deboo*, No. 1:11CV68, 2012 WL 2359440, at *4 (N.D. W. Va. Jan. 18, 2012) (concluding that plaintiff had not provided any evidence that defendant warden was involved in the denials of his requests for medical or surgical procedures), *R&R adopted by* 2012 WL 2359435 (N.D. W. Va. June 20, 2012), *aff'd*, 482 F. App'x 852 (4th Cir. 2012); *Sundly v. Wilson*, No. 08–cv–506–slc, 2009 WL 1587221, at *1 (W.D. Wis. June 5, 2009) (determining that certain defendants were entitled to summary judgment because they had no involvement in deciding whether plaintiff should receive surgery for his finger).

Moreover, the record refutes any claim that McBee may make that Defendants Laybourn and Dicocco failed to provide him care for his knee issues. On the contrary, the record establishes that McBee received a great deal of medical care for his knee issues. As noted above, on October 30, 2014, MLP Negron requested that McBee see an orthopedist for his chronic knee pain. (ECF No. 26–2, at 8.) On November 19, 2014, MLP Negron prescribed Acetaminophen and gave McBee a Toradol injection for his knee pain. (*Id.* at 16.) In December of 2014, the orthopedist "recommended that Mr. McBee receive a total right knee replacement due to degenerative joint disease." (Dicocco Decl. ¶ 5; *see* Laybourn Decl. ¶ 5; ECF No. 26–3, at 7.) McBee's request for a right knee replacement was denied by the regional URC, however, because of McBee's high BMI and "the cardiovascular risks inherent to his weight." (Dicocco Decl. ¶ 9; *see* ECF No. 26–4, at 7.)

Subsequently, both Defendants Dicocco and Laybourn counseled McBee about the need for him to lose weight in order to meet the BOP's criteria for a total right knee replacement.

---

[9] Indeed, none of the Defendants determined whether McBee would receive knee replacement surgery.

(ECF No. 26–2, at 22, 24; ECF No. 26–3, at 20; Laybourn Decl. ¶ 9.) Instead of losing weight, however, McBee continued to gain weight. (*Compare* ECF No. 26–2, at 11 (noting that McBee weighed 270 pounds on November 6, 2014), *with id.* at 25 (noting that McBee weighed 290 pounds on October 13, 2016). Because of this, McBee's second request for a total right knee replacement was deferred by the regional URC. (ECF No. 26–2, at 31.) McBee was again informed that he needed to lose weight "for the surgery to be safe given the high risk for negative side effects of surgery in obese patients." (Laybourn Decl. ¶ 9.) Throughout this time, McBee was "treated continuously for his knee pain, including, but not limited to, receiving Synvisc injections to his knee in order to alleviate the pain and discomfort." (Dicocco Decl. ¶ 12; *see* Laybourn Decl. ¶ 10.) McBee also received nutritional counseling for weight management so that he could attempt to lose weight in order to meet the BOP's criteria for the knee replacement. (ECF No. 26–2, at 37–38; ECF No. 26–3, at 18–19.)

Overall, the uncontroverted evidence establishes that Defendants Dicocco and Laybourn were not deliberately indifferent to McBee's knee condition. On the contrary, medical staff at FCI Petersburg, including Defendants Dicocco and Laybourn, provided continuous nonsurgical care to McBee for his condition. Because a total knee replacement posed a high risk of negative side effects due to McBee's weight, such nonsurgical care was "adequate [and] reasonable." *Johnson v. Doughty*, 433 F.3d 1001, 1014 (7th Cir. 2006) (citations omitted); *see Ward v. Deboo*, No. 1:11CV68, 2012 WL 2359435, at *1–3 (N.D. W. Va. June 20, 2012) (rejecting inmate's Eighth Amendment claim regarding denial of knee replacement surgery because defendants provided continuous nonsurgical treatment and cautioned that inmate's weight would likely preclude successful surgery). At most, McBee has alleged a disagreement with the course of treatment provided to him, which is insufficient to maintain his Eighth Amendment claim. *See*

*Wright*, 766 F.2d at 849 (citing *Gittlemacker*, 428 F.2d at 6). Accordingly, Claim One will be DISMISSED.

### B.     Claim Two—Defendants Wilson and Caraway

In Claim Two, McBee asserts that Defendants Wilson and Caraway violated his rights under the Eighth Amendment by overlooking McBee's need for a total knee replacement when considering McBee's administrative remedy requests. (ECF No. 4–1, at 6–7, 10–13.) McBee, however, demonstrates no deliberate indifference to his medical needs by Defendants Wilson and Caraway. The record conclusively demonstrates that Defendants Wilson and Caraway reasonably responded to McBee's administrative remedy requests regarding his medical care. In their responses, Defendants Wilson and Caraway noted that McBee was under the care of his primary care provider team at FCI Petersburg and that McBee had been provided care and treatment consistent with BOP and community standards. *See Iko*, 535 F.3d at 242 (omission in original) ("If a prisoner is under the care of medical experts . . . , a nonmedical prison official will generally be justified in believing that the prisoner is in capable hands." (quoting *Spruill v. Gillis*, 372 F.3d 218, 236 (3d Cir. 2004))).[10] To the extent that McBee disagrees with his provider team's assessment and the proper course of action for treating his knee pain, McBee's disagreement fails to demonstrate deliberate indifference by Defendants Wilson and Caraway, who had no medical training and could only rely upon McBee's provider team's medical judgment. *See id.* Moreover, because Defendants Wilson and Caraway responded reasonably to McBee's administrative remedy requests regarding his medical care, they cannot be found to have acted with a sufficiently culpable state of mind to establish deliberate indifference. *See*

---

[10] To the extent that McBee contends that Defendants Wilson and Caraway violated his rights by providing unsatisfactory answers to his grievances, McBee has no constitutional right to grievance procedures. *Adams v. Rice*, 40 F.3d 72, 75 (4th Cir. 1994). Furthermore, "there is no liability under [*Bivens*] for a prisoner administrator's response to a grievance or appeal." *Brown v. Va. Dep't of Corr.*, No. 6:07CV00033, 2009 WL 87459, at *13 (W.D. Va. Jan. 9, 2009).

*Brown*, 240 F.3d at 389 (alteration in original) (internal quotation marks omitted) (holding that "an official who responds reasonably to a known risk has not disregard[ed] an excessive risk to inmate health or safety . . . and has therefore not acted with deliberate indifference"). McBee fails to demonstrate that Defendants Wilson and Caraway acted with deliberate indifference to McBee's medical needs. Accordingly, Claim Two will be DISMISSED.

## IV. CONCLUSION

For the foregoing reasons, Defendants' Motion for Summary Judgment (ECF No. 25) will be GRANTED. Defendants' Motion to Dismiss (ECF No. 24) will be DENIED AS MOOT. McBee's claims and the action will be DISMISSED.

An appropriate Order will accompany this Memorandum Opinion.

/s/

Roderick C. Young
United States Magistrate Judge

Date: September ⎸ , 2017
Richmond, Virginia